*Benedict & Phelps,* for appellant.

*L. C. Rockwell,* for appellee.

————————→•◄————————

# THE DENVER & NEW ORLEANS RAILROAD CO. *v.* THE ATCHISON, TOPEKA & SANTA FE RAILROAD CO.

(*In the Circuit Court of the United States, District of Colorado, February, 1883.—Suit in Equity to compel the defendant to do business with the plaintiff on the same terms, and in like manner, as it hath done and is wont to do with the Denver & Rio Grande Railway Company.*)

1. CARRIERS—NOT PERMITTED TO DISCRIMINATE IN CONDUCT OF BUSINESS. The duty of common carriers to give equal service on equal terms, and upon reasonable compensation, to all who may apply to them to carry persons or property, is an established rule of the common law, and is expressly enjoined in the constitution of Colorado. (Sec. 6, Art. 15.)

2. SAME—EFFECT OF SUCH RULE—PUBLIC POLICY. This, as a rule of law, must carry with it all that is essential to its due observance and enforcement—as well what is fully expressed therein as all that may arise therefrom by necessary implication. Whatever is inconsistent with it, or with the purposes for which it was adopted, is against public policy and cannot be upheld. It is a rule of conduct for carriers which is designed to give the public the largest use of public conveyances which may be consistent with the service, and which leaves to carriers only such powers as are necessary to the business.

3. SAME—CONTRACT BETWEEN, TO EXCLUDE COMPETITION, VOID. A contract between common carriers to apportion the country between themselves, and to refuse to enter into or allow business relations with competing lines, constructed or to be constructed, is in the nature of a conspiracy to grasp commerce and suppress the building of railroads, is in restraint of trade, and therefore void as against public policy.

4. CONSTITUTIONAL PROVISIONS—SCOPE AND EFFECT OF—WHEN SELF-EXECUTING. The constitution of Colorado imports that railroads in the State are to be operated in conjunction for the convenience of the public, at least to the extent usual and customary between connecting lines in the control of companies not hostile to each other. A constitutional provision may be said to be self-executing if it supplies a sufficient rule by means of which the right given may be enjoyed and protected, or the duty imposed may be enforced.

5. THE REMEDY IN EQUITY. Unlawful and unjust discrimination between railroad companies engaged in the carrying business may be enjoined in

equity, in a suit by the party aggrieved against the party practicing such discrimination.

### PLEADINGS.

The original bill was filed March 31, 1882, before complainant's road between Denver and Pueblo was finished. Complainant alleged that it was organized in the State of Colorado with authority to construct a road from Denver to Pueblo, in said State; that it was then engaged in building such road, and had, in fact, built about fifty miles thereof; that a certain other road, known as the Pueblo and Arkansas Valley Railroad, had been built from Pueblo eastward along the valley of the Arkansas river to a junction with defendant's road, at the eastern boundary of the State; that defendant is a Kansas corporation, which owns and operates a road from the junction aforesaid to Kansas City, in the State of Missouri; that the Pueblo and Arkansas Valley road is held by defendant as lessee, and with defendant's road it forms a continuous line from Pueblo to Kansas City; that complainant desires to connect its road with the said Pueblo and Arkansas Valley road at Pueblo, and to operate the same in connection with defendant's line in the transportation of goods and passengers between Denver and Kansas City, and points intermediate, which may be reached by the several roads in connection; that, by the usage and custom of railroads in Colorado and elsewhere throughout the United States, passengers and their baggage are transported over connecting railroads on through tickets issued by the several roads so operated in connection, as convenience and safety may require; and goods are sent in carload lots, and otherwise, each company receiving the money due it for carriage from the company to which the same may be delivered in the course of transportation. The course of business in the transportation of passengers and goods is set forth in detail. Complainant also alleged that, by the constitution and laws of the State of Colorado, it was entitled to connect its road with the said Pueblo and Arkansas Valley Railroad at Pueblo, and to employ its road in connection with defendant's line in the carrying business between Kansas City and Denver, and other points on the said roads. But that de-

fendant denied complainant's right so to connect its road, and to participate in the transportation of goods and passengers.

The prayer was similar to that of the supplemental bill, which will be given hereafter.

A supplemental bill was filed June 13, 1882, which recited briefly the principal matters of the original bill; and alleged that complainant's road had been completed to Pueblo, and there under an order of the District Court of Pueblo county, a connection had been made with defendant's road, but that defendant still refused to transact any business with complainant. On that subject, and the business relations existing between defendant and the Denver and Rio Grande Railway Company, the bill and the prayer is as follows:

"But, notwithstanding the premises, the said defendant, ever since the completion and equipment of your orator's said railroad, hath refused and still doth refuse to exchange freights and passengers with your orator at the said connection, or to receive from your orator, or transport over its railroad, or the said Pueblo and Arkansas Valley Railroad, passengers, baggage, mails, freights or express freights transported over the railroad of your orator, or to deliver to your orator passengers, baggage, mails, freights, or express freights, transported over the said Pueblo and Arkansas Valley Railroad, destined for points on the line of your orator's railroad, or in any manner to exchange freights or passengers or do business with your orator; but contriving and intending to injure, defraud and oppress your orator, ever since the completion of your orator's said railroad, hath been wont to, and still is wont to deliver at the said City of Pueblo, all passengers, freights, express freights, freight cars, passenger cars, and baggage cars transported over its said railroad and destined for the said City of Denver or points beyond the same, to the Denver and Rio Grande Railway Company, a certain other corporation owning and controlling a railroad parallel to and competing with the railroad of your orator, and extending from the said City of Pueblo to the said City of Denver.    And upon information and belief your orator further avers that, ever since the completion of your orator's said railroad, the said defendant hath been and still is wont to receive from said Denver

and Rio Grande Railway Company at said City of Pueblo, passengers, with their baggage, freights, express freights, mails, sleeping cars, baggage cars, loaded freight cars and other rolling stock destined for points on and beyond the railroads controlled by defendant as aforesaid, and transport the same over the railroads so controlled by defendant upon through tickets and bills of lading issued by the said Denver and Rio Grande Railway Company; and in like manner to receive at all points upon said Pueblo and Arkansas Valley Railroad and other roads controlled by defendant, passengers with their baggage, freights, express freights, sleeping cars and loaded freight cars, destined for the City of Colorado Springs and said City of Denver, and other points beyond the same, and transport the same over the railroads controlled by defendant to the said City of Pueblo, upon through tickets and bills of lading issued by said Denver and Rio Grande Railway Company or by said defendant, and at the City of Pueblo aforesaid, deliver the same to said Denver and Rio Grande Railway Company, to be carried to destination, each of said companies receiving from the other its due share for the transportation of all such passengers and loaded cars and car service transported upon tickets or contracts issued by the other of said companies, monthly; and its due share for the transportation of freights not in loaded cars, daily.

"Nevertheless the defendant refuses to extend to your orator the same privileges aforesaid.

"And upon information and belief your orator further avers that, although divers merchants of the said City of Denver have applied to the said defendant to cause the goods of said merchants shipped and transported over the said Pueblo and Arkansas Valley Railroad to be forwarded from the said City of Pueblo by your orator's railroad, the said defendant hath refused to comply with the said requests, and intending to injure and embarrass your orator, and to prevent passengers and freights from passing or being shipped over the road of your orator, the said defendant hath published and put in circulation divers public notices to the effect that the said defendant hath made no agreement with your orator for any interchange or through business, and that through tickets by the way of

your orator's road will not be honored for passage on the trains of the said defendant, and that all shipments of freights for the city of Denver or Colorado Springs consigned to the care of your orator will be treated as Pueblo local business, and that no authority is given to any one to make contracts or issue bills of lading to Denver or Colorado Springs over your orator's railroad from Pueblo.

"To the end, therefore, that the said defendant may, if it can, show why your orator should not have the relief hereby, and by your orator's original bill aforesaid prayed, and that your orator may have the same relief against the said defendant as if the facts hereinbefore stated and charged by way of supplement had been stated in your orator's said original bill, and that the said defendant may be required to exchange passengers and freights with your orator at the connection of your orator's said railroad with the said Pueblo and Arkansas Valley Railroad, and to extend to your orator all the facilities for such exchange which in such case are or hereafter may be usual or customary between railroad companies operating connecting railroads, and to receive from your orator at the said point of connection all passengers, with their baggage, and all mails, freights, express freights, mail cars, express cars, sleeping cars, baggage and passenger cars, and freight cars or other rolling stock destined for points on the said Pueblo and Arkansas Valley Railroad, or the said Atchison, Topeka and Santa Fe Railroad, or beyond either terminus of either of the said railroads, and transport the same to the destination thereof or to the point of terminus nearest such destination upon the railroads operated or controlled by the defendant, upon the tickets, checks, contracts, or bills of lading issued by your orator; and at the said destination to deliver such mails, freights, express freights, and cars, to the consignee thereof or to the next carrier in the line of transport, and for its due and proportionate share of a reasonable passage and freight money (not exceeding the rate by it charged for the transportation of passengers or freights by it received from any other railroad company or carrier) and for reasonable car service to be paid by your orator upon all cars of the said defendant delivered to your ora-

42

tor, such freight moneys and car service to be fixed in such manner from time to time as the Court may direct, such share of said passage money and such car service to be accounted for and paid over by your orator from time to time, and monthly at all events, as your orator hereby offers to do; and your orator's share of said freight moneys to be paid to your orator upon all freights on the delivery thereof by your orator; and also at the said point of connection to deliver to your orator all passengers traveling upon the said Pueblo and Arkansas Valley Railroad who may desire to proceed from the said point of connection by or over the railroad of your orator to points thereon and beyond the same, with their baggage; and also all mails, freights, express freights, mail cars, express cars, sleeping cars, baggage and passenger cars, freight cars and other rolling stock transported over the said Pueblo and Arkansas Valley Railroad, and which may be marked or directed to be shipped or transported over your orator's railroad to points on the line thereof or beyond the same; and that said defendant be perpetually restrained and enjoined from preventing any person desiring so to do from traveling and being transported with the baggage of such persons, by your orator's trains from the said point of connection with your orator's railroad; and from preventing any person desiring so to do from traveling and being transported with the baggage of such persons, or shipping freights or express freights, from the said point of connection over the said Pueblo and Arkansas Valley Railroad, or the said Atchison, Topeka and Santa Fe Railroad, or other roads connecting therewith, or with either thereof, to the destination of such persons or freights, upon through tickets, contracts, or bills of lading issued by your orator; that said defendant be likewise restrained from delivering to any other carrier, railroad company, or person, any baggage, mails, freights, express freights, mail cars, express cars, passenger cars, baggage cars, sleeping cars, freight cars, or other rolling stock, checked, marked or directed to be shipped by or over your orator's said railroad; and from preventing such baggage, mails, freights, express freights, mail cars, express cars, passenger cars, baggage cars, sleeping cars, freight cars, or other rolling stock from being delivered to your orator

at the said point of connection; and from demanding or receiving for transportation over said Pueblo and Arkansas Valley Railroad, and said Atchison, Topeka and Santa Fe Railroad, or either thereof, or the branches thereof, or roads connecting therewith controlled by the defendant, for the transportation of passengers, or their baggage, mails, freights, express freights, mail cars, express cars, baggage cars, passenger cars, sleeping cars, freight cars, or other rolling stock which may have been transported over, or may be destined for your orator's railroad any unreasonable fares or freights, or any greater fare or freight, than upon and for the transportation of passengers, baggage, mails, freights, express freights, or rolling stock received from or destined for any other railroad, for or between points reached by your orator or your orator's said railroad, and other carriers connecting therewith; or any greater rate than is or shall be charged by said defendant for transporting such freight, passengers, baggage, express freights, and cars, if sent by any other line; or any greater rate or sum than the fair and proportionate share of the reasonable passage or freight money, fixed and determined by, or under the direction of this Honorable Court; or that your orator may have such other and different relief, or such further relief as to Your Honors may seem meet."

The answer denies the bill fully, and refers to a contract which is sufficiently described in the opinion of the Court.

HALLETT, J.

### OPINIÓN.

The duty of common carriers to give equal service on equal terms and upon reasonable compensation to all who may apply to them to carry persons or property, is as well established as any rule of common law. As to railroads it is expressed in Sec. 6. Art. 15, of the constitution of this State, in the following language:

"All individuals, associations and corporations shall have equal rights to have persons and property transported over any railroad in this State, and no undue or unreasonable discrimination shall be made in charges or in facilities for transportation of freight or passengers within the State, and no railroad company, nor any lessee, manager or employee thereof

shall give any preference to individuals, associations or corporations in furnishing cars or motive power."

As a rule of law, it must carry with it all that is essential to its due observance and enforcement. It is good for what is fully expressed in it, and for all that may arise therefrom by necessary implication. Whatever is inconsistent with it, or with the purposes for which it was adopted, is against public policy, and cannot be upheld. It is a rule of conduct for carriers which is designed to give the public the largest use of public conveyances which may be consistent with the service, and one which leaves to carriers only such powers as are necessary to the business. Thus the carrier may charge for his services, because he cannot work without pay; but he is allowed only a reasonable price, such as will be fair compensation for his labor; he may exclude from his carriage explosive compounds which may be dangerous to other goods and the carriage itself; he may also exclude thieves and gamblers and other mischievous persons who may be traveling for an unlawful purpose. These and the like things, for the good of the service the carrier may do, but in general he must have regard for the public interest in all that he does; for, as said by the Supreme Court, "he is in the exercise of a sort of public office, and has public duties to perform from which he should not be permitted to exonerate himself without the assent of the parties concerned." *New Jersey Steam Navigation Co.* v. *Merchants' Bank*, 6 How., 382; *Munn* v. *Illinois*, 4 Otto, 130.

If, then, a common carrier can set no limits to the service in which he is engaged except such as are inherent in it, the position of the defendant in this controversy is made plain. The defendant refuses to carry to or from Denver and points between Denver and Pueblo, except in connection with the Rio Grande road; not absolutely indeed, but for the price charged in connection with that road. To say to the public that the rate shall be less by the Rio Grande road than by any other line is, in effect, to say that the public shall use that road only. A very little difference in the tolls will prohibit traffic over other lines; and clearly enough such was the effect in this case. It is admitted that defendant refuses to carry in connection with complainant at the same rate of charges as with the Rio

Grande Company, and that it charges for such carriage a much
higher rate; for all practical purposes that course of proceed-
ing amounts to a refusal to carry except in connection with the
Rio Grande road.

In support of its refusal to deal with complainant as a con-
necting road, defendant avers that it has entered into a contract
with the Rio Grande Company for making a "through line"
and doing "through" business between the Missouri river and
Denver, which is of great advantage to defendant, and which
cannot be maintained, except on the theory of exclusive deal-
ing between the parties thereto. So understood, the contract
is open to the objection that it gives no choice of route to trav-
elers and shippers of goods, of which something will be said
hereafter. The answer, however, gives no intimation as to the
true character of the contract as it appears in evidence. It is
an agreement between the Union Pacific Company of the first
part, the defendant and its leased lines of the second part, and
the Rio Grande Company of the third part, for a division of
territory and traffic in Colorado and New Mexico. At the time
it was made, March 22, 1880, these companies owned or con-
trolled all the railroads in Colorado and the northern half of
New Mexico, and they assume in this agreement to divide the
country and to allot to each of the parties its separate portion
for the purpose of building new railroads. The parties are
severally bound not to trespass on the territery of other parties
as defined in the agreement, and each stipulates with the other
that it will not "voluntarily connect with or take business
from or give business to, any railroad which may be hereafter
constructed" in the territory of the other. After settling the
question of new roads, the parties proceed to a division of
traffic in paragraphs four, five and six of the contract, as fol-
lows:

"*Fourth*—All traffic to and from the Missouri river, and all
competitive local traffic, both passenger and freight, to and
from the territory south and west of Denver, reached and cov-
ered by the Denver and Rio Grande Railway Company or the
Denver, South Park and Pacific Railroad Company, and lines
controlled or constructed or to be constructed by them or
either of them, or promoted by and connected with them or

either of them, shall be pooled between the Union Pacific Railway Company and the Atchison, Topeka and Santa Fe Railroad Company, one-half to each. Also all traffic to and from the Missouri river, and to and from competitive local points, both freight and passenger, to and from Denver, shall be divided, three-quarters to the Union Pacific Railway Company, and one-quarter to the Atchison, Topeka and Santa Fe Railroad Company, each company in each case to deduct forty per cent. as cost of operating; it being understood and agreed that all local business, both passenger and freight, to and from the Denver, South Park and Pacific Railroad Company, east of and including Weston station, shall be treated as Denver business, and divided accordingly. It is also understood that the party of the third part is not to do any through business to and from Trinidad, or to and from New Mexico via Trinidad or El Moro.

"*Fifth*—That as long as the parties of the second part, and each of them, shall keep the agreements on their behalf herein contained, one-half of all the traffic, both passenger and freight, originating in Colorado, and also in New Mexico at points as far south as the party of the third part is authorized to build under article two of this agreement, and coming or delivered to the party of the third part for transportation over any of the lines of the party of the third part, constructed or to be constructed or promoted by it, or coming or delivered to it for transportation from lines connecting with it, and destined for points east of the line between Denver and El Moro, and said line extended northerly and southerly, shall be delivered at South Pueblo for transportation over the railroads controlled by the parties of the second part, and the other half at Denver for transportation over the railroads controlled by the party of the first part, as far as the party of the third part can legally control such traffic. It is further agreed that, as to all traffic, both freight and passenger, interchanged between the party of the third part and the other parties hereto, to and from Denver via South Pueblo, and from and to South Pueblo via Denver, the party of the third part shall be entitled to and shall prorate with the other parties at the rate of one mile and a half to one; that is to say, shall be entitled to and shall

share in the distribution of such total fare and freight moneys
for each mile of actual haul done by the Denver and Rio
Grande Railway Company, as if the same were carried by it
one mile and a half, but the allowance of extra mileage shall
in no event exceed local rates, and in case of any more favor-
able pro rata being given to the party of the first part, the
same shall be given to the party of the second part. It is fur-
ther agreed that the rates between South Pueblo and Lead-
ville, and between South Pueblo and all other points west of
Pueblo, shall be as low as between the same points and Den-
ver, under any and all circumstances, and the party of the
third part shall not discriminate against the parties of the sec-
ond part, in respect of cars or other facilities for transfer of
freight or passengers.

"*Sixth*—In order to enable the party of the third part to
carry out its obligations under the above article, and for its
protection, it is further agreed that the parties of the second
part shall, as long as the party of the third part shall keep the
agreements on its part herein contained, deliver at South Pu-
eblo for transportation any traffic, passenger or freight, des-
tined from points east of the said line of the party of the third
part to points on its line constructed or to be constructed or pro-
moted by it, or connecting with it in Colorado, and also in
New Mexico to points on its line as far south as the party of
the third part is authorized to build under article second of
this agreement, and shall not deliver to, or cause the same to
be transported over, or voluntarily receive the same from any
other line or railroad in the territory named than that of the
party of the third part, so far as the said parties of the second
part can legally control the same. And that any agreement
or understanding of the parties of the first and second parts
with each other, or of both or either or any of them with any
competing railroad for division of business or territory or earn-
ings that might divert business which would otherwise under
this agreement pass over the lines of the party of the third
part, shall provide for securing to the party of the third part
a proportionate benefit on the mileage basis, stated in article
five, for not less than one-half of the southern and western
business, and one-fourth of the Denver business, as provided

in article four of this agreement; provided that this shall not prevent the party of the second part from making any agreement or understanding with the Atlantic and Pacific Railroad Company without incurring any liability to the party of the first or third parts."

Of this remarkable document it will not be necessary to speak at length in this connection. To do so would, perhaps, convey an impression that for some purposes these corporations have the powers which in this instrument they have assumed to exercise. It is enough to say that it is a conspiracy to grasp commerce and suppress the building of railroads in two great States. Similar provisions have fallen under the condemnation of other Courts whose judgment of them has been clearly expressed. In *Hartford and N. H. Co.* v. *New York and N. H. Co.*, 3 Rob. (N. Y.), 411, it was held that a provision in a contract forbidding one of the parties to extend its road, would avoid the contract. An association of carriers to regulate the price of freight, with provisions prohibiting the members from engaging in a similar business out of the association, has a tendency to increase the price of carriage and to suppress competition, and is therefore illegal. *Stanton* v. *Allen*, 5 Denio, 434; *Hooker* v. *Vandewater*, 4 *Ib.*, 349.

The Rio Grande Company also agrees in this instrument, "Not to do any through business to and from Trinidad, or to and from New Mexico via Trinidad or El Moro;" an express enunciation of a duty enjoined by the State, and therefore void. If that company can decline a part or all of the carrying business at Trinidad, it may also abandon its entire line, and refuse to serve the public in any way. *Shrewsbury & Birmingham Railway Co.* v. *London & Northwestern Railway Co.*, 4 De G., M. & G., 415; S. C., 6 H. of L. Cases, 113; *State* v. *Hartford & New Haven Co.*, 29 Conn., 538; *Union Pacific Co.* v. *Hall*, 1 Otto, 343.

A more objectionable feature of this instrument is that in which the parties agree not to "connect with or take business from, or give business to, any railroad" which may be constructed in Colorado or New Mexico after its date. That is to say, these powerful corporations, having secured a monopoly of the carrying business in two States, will hold it indefi-

nitely, and refuse to recognize or deal with any rival that may enter the field. Argument is not necessary to show that a compact of this kind is against public policy, and therefore void. Certain corporations of Pennsylvania controlling coal produced in a large district of country made a combination to regulate the supply and the price, which was held to be illegal. (*Morris Run Coal Co.* v. *Barclay Coal Co.*, 68 Penn. St., 173.) In this instance the combination is to control the carrying trade of a great country, which is of much greater importance to the people than coal.

It is believed, however, that the true principle mentioned at first should control, without reference to any compact or agreement, valid or otherwise, that may have been made. The carrier service is subject only to conditions and limitations necessary to its existence, and not such as the carrier himself may impose from motives of gain or other purpose. If the defendant may elect to' receive goods and passengers at Pueblo from the Rio Grande Company, and to deliver to that corporation alone, other conditions may be added, as that the goods shall be brought in wagons and the passengers on horseback. What right has the defendant to say that goods or passengers shall come to it in one way or another? or that goods and passengers carried by it shall be carried to other points beyond its terminus by one company only? The answer of defendant is, that such arbitrary distinctions are profitable to it, and, therefore, lawful. Its first duty is to its stockholders; and anything that will bring money to its exchequer is permissible. In the Courts a different view of the subject prevails.

*Twells* v. *Pennsylvania Railway Co.* is a case decided in the Supreme Court of Pennsylvania, for which the reporter of that Court was probably unable to find space in the regular series of reports. The case may not be of interest to the corporations of that State. The opinion is, however, printed in 3 American Law Register, N. S., 728, and, as it is cited by the Court in later cases, it seems to be authentic. Defendant's road extended from Pittsburg to Philadelphia, and it had arranged with some other road to carry from Philadelphia to New York, so that it was able to carry through to the latter place from

43

points on its own line. By raising the local rates between Pittsburg and Philadelphia, defendant sought to compel shippers to patronize its through line. As the question is stated by the Court, defendant said to plaintiff, "Employ us to carry your oil, not only over our road to Philadelphia, but thence to New York. If you do not, we will exact from you, for its carriage to Philadelphia, six cents per 100 pounds more than we demand from all others who employ us to transport similar freight only to Philadelphia; or, if you will employ us to carry it to New York, after it shall have reached Philadelphia, we will carry it to Philadelphia for six cents less per 100 pounds than we are accustomed to charge others for similar transportation." And the Court then adds: "No one will maintain that they can lawfully make such a stipulation for the benefit of a third party, *e. g.*, one of two other carriers. They cannot say to a shipper at Pittsburg of any domestic product, 'You have freight destined to New York. You must send it over our road to Philadelphia. If, when it arrives there, you will forward it by A to New York, we will carry it over our line at certain rates. If you send it by any other than A, our charges will be higher.' This is a discrimination that cannot be allowed. Conceding it, would put in the power of the defendants a monopoly of the carriage of all articles which pass over their road from either terminus to every place of final delivery. The oppressive effects of such a rule are the same, whether its motive be to benefit third parties or the railroad company itself. Of the transportation along the line of their road, the defendants practically have a monopoly. It is not consistent with the public interest, or with common right, that they should be permitted so to use it, as to secure to themselves superior and exclusive advantages on other lines of transportation beyond the ends of their road." The Court cites *Baxendale* v. *Great Western Railway Co.,* 1 Neville & McNamara, 191, which clearly supports the view expressed. That case is said to be reported in 5 C. B., N. S., 309, and other English books, as in Neville & McNamara.

So, also, a carrier cannot refuse to receive a passenger on the ground that his coach connects with another which extends the line to another place, and he has agreed with the proprie-

tors of such other coach that he will not receive passengers from such place unless they come in his coach. (*Bennett* v. *Dutton*, 10 N. H., 481). On the same principle a railroad cannot elect to deliver grain at one warehouse on the line of its road to the exclusion of other warehouses. (*Chi. & N. W. Railway* v. *The People*, 56 Illinois, 365). Or to deal with one express company to the exclusion of other express companies. (*Sandford* v. *P. R.*, 24 Penn. St., 378; *New England Express Company* v. *Maine Central R. R. Company*, 57 Maine, 188). These cases are sufficient to show the weight of authority in support of the rule as stated, that a carrier cannot hamper or limit his duty to the public except in matters essential to the service.

The opposite view has secured recognition from some eminent Judges, as in *Jencks* v. *Coleman*, 2 Sumner, 221, but great names do not prevail against great principles, and should not be allowed to do so in this instance.

In all that has been said, the right of the defendant to arrange with the Rio Grande Company for a through line to Denver and elsewhere, and to carry in connection with that company, has not been impugned. We recognize the authority of railroad companies to unite in continuous lines for greater facilities in the transportation of passengers and freight as established in numerous cases. In fact, the constitutional provision to which we shall presently refer, seems to demand such union. But we maintain the right of travelers and shippers of goods to choose between rival lines of railroads without let or hindrance from the latter. We deny the power of a railroad company in the use of its own road, by discriminating charges or other arbitrary measures, to compel the public to resort to any other road, or adopt any particular course in the transmission of goods or passengers. This proposition stands with the general rule before mentioned, that carriers shall not limit or trammel with arbitrary distinctions the service to be rendered; that all roads shall be open to wholesome competition as declared in the cases in 4th and 5th Denio, and with the doctrine that the carrier shall follow the instructions of his patrons to the extent of forfeiting his earnings in case of disobedience. *Robinson* v. *Baker*, 5 Cush., 137.

We hold, therefore, that defendant is bound to give to com-

plainant reasonable facilities for the exchange of passengers
and freight at Pueblo, as to all who desire to use complainant's
line in connection with its own, and for the price of carriage
charged to persons who use the Rio Grande road in connection
with defendant's road. There is some difficulty in deciding what
such facilities shall be. On demurrer to the bill we had occasion
to consider the meaning of section 4, article XV, of the constitu-
tion, which declares the right of every railroad to connect with
every other railroad, and we arrived at the conclusion that the
connection mentioned in the constitution is of a business char-
acter, involving the interchange of passengers and freight in
the manner usual and customary between railroads throughout
the country. Objection is now made that the clause referred
to is authority to the Legislature to pass laws on the subject,
but otherwise incapable of enforcement. We have not main-
tained that the physical connection of tracks provided for
could be made without a law to direct the course of proceed-
ing. In this case it is conceded that the roads are united, and
the question is, whether any use shall be made of the connec-
tion. And we shall not attempt to point out the course of leg-
islation or the limits to which it may extend under that sec-
tion. Independently of legislative power and action, the clause
conveys to us the idea that railroads in this State are to be op-
erated in conjunction for the convenience of the public, at
least to the extent usual and customary between connecting
lines in the control of companies not hostile to each other.
What more may remain for the consideration and judgment
of the Legislative Assembly we are not concerned to know.
"A constitutional provision may be said to be self-executing if
it supplies a sufficient rule by means of which the right given
may be enjoyed and protected, or the duty imposed may be en-
forced." (Cooley's Con. Lim., 101). Within this rule the sec-
tion is obligatory on railroads to the extent indicated, if no
further.

It is also objected that this construction of the section brings
it into conflict with section 8, article I, of the Constitution of
the United States, which confers on Congress the power "To
regulate commerce with foreign nations and among the several
States." The clause referred to directs what shall be done

within the State for the advantage of the people of the State. Whatever the effect may be on inter-State commerce until Congress shall act on the subject, such regulation is within the authority of the State.    *Munn* v. *Illinois*, 4 Otto, 113; *Peik* v. *Chicago & Northwestern Company, Ibid,* 164.

Many witnesses in the service of prominent railway companies were examined as to the course of business between railway companies in the United States in forming continuous lines, and sending freight and passengers over connecting roads.    The greater number concur in the statement that such arrangements are the subject of special agreement, as to which the corporations interested claim and exercise the absolute authority of natural persons in the daily affairs of business. The evidence discloses what is fully known to all who have given any attention to the subject, that as to business intercourse railway companies assume to be absolutely independent of each other. In the strife of competition it is not strange that each should assume to have authority in all things—and yet they do not absolutely refuse to take passengers and freight from each other.    In *Bennett* v. *Dutton* (10 N. H.), in 1837, when the carrying business was young, defendant refused to take plaintiff in his coach because the latter had been guilty of riding in a rival coach.    But now the managers of railroads are too wise in the law to make such blunders.    By discriminating charges business may be sent in one way or another to avoid a rival line, as well as by refusing to deliver to such line.    An illustration not given in the evidence, but within the knowledge of many persons in this community, may be recalled.    Not many years ago the Union Pacific road and the Denver Pacific road were in the control of companies hostile to each other. They did not refuse absolutely to deliver freight and passengers to each other, but they could not agree on the rates to be charged by each company; and goods from California consigned to Denver were carried by Cheyenne to Omaha, 600 miles east of Denver, and then to Kansas City, 200 miles south, and back to Denver, 639 miles.    This circuit of more than 1,400 miles was made to avoid the use of the Denver Pacific road from Cheyenne to Denver, a distance of 110 miles, or something like that.    If railway companies impose such onerous burdens

on the public it must not be supposed that they have authority of law for it.    Returning to the evidence, it sufficiently shows that passengers and freight are freely exchanged between connecting railroads in most cases.    This is the rule, and the exception arises when one of the parties conceives that it can make more money by some other course.    Obstacles are then made to the continuance of friendly relations in the way of discriminating charges and the like, and the companies become hostile to each other.    Now the right of railroad companies to raise such obstacles in their own interest and against the public interest, is the very matter in issue in this cause. We have endeavored to show that they have no such right, and if we have succeeded, the practice itself is not now in the way, of granting relief in this cause.    If that has not been shown further discussion will not avail.

We perceive that there is a difficulty in setting up these companies to be agents each for the other in the sale of tickets for passage over both lines, and for making through contracts binding on both companies for the transportation of goods. But some things may be done without making either company an agent for the other, and without bringing the companies into any relation of contract or agreement as between them. Passengers and their baggage may be delivered at the junction of the roads by each company, to be transported by the other, and goods may be forwarded in car-load lots and otherwise on terms that will not involve any contract made by one of these companies for and on behalf of the other.    The defendant accepting the services of other railroad companies in selling through tickets, and making through contracts over its own line in connection with the Rio Grande road, ought not to object to the same company's performing the same service for complainant if they are willing to do so; nor should defendant be heard to say that it will not carry goods or passengers, on the ground that they are to be carried further by complainant from defendant's terminus to some other point.    It is, however, unnecessary to discuss in detail the relief to be granted, as that can be well enough expressed in the decree. In this opinion we seek only to define the general rule.

The decree will be for the complainant, but not to the full extent of the prayer of the bill.

McCRARY, Circuit Judge, concurs.

DECREE,
### Entered March 1, A. D. 1883.

This cause came on to be heard at this term of Court, and was argued by counsel, and thereupon, upon consideration thereof, it was ordered, adjudged and decreed by the Court that the said defendant do from henceforth exchange passengers and freight with the plaintiff at the junction of the plaintiff's railroad with the Pueblo and Arkansas Valley Railroad, near to the city of Pueblo, in the county of Pueblo, as in the bill mentioned, and that each party extend to the other all facilities for such exchange of passengers and freights which are or may be hereafter usual or customary between railroad companies operating connecting railroads, except as hereinafter otherwise provided, and that each company shall cause all regular passenger trains moving upon its railroad to be stopped, upon all trips, at the said junction, and at the platform or depot erected thereat by the plaintiff, a reasonable and sufficient time to enable passengers to conveniently and safely alight from and get upon such trains, and express matter and mails to be delivered therefrom and thereto at the said station; and that the freight trains of each company shall stop at the proper tracks near to the same station whenever the agents of the other company shall signify to those operating such freight trains that there is freight at the said station to be delivered to such train.

*Second*—And that whenever hereafter merchandise or freight shall be received or come to the hands or control of the defendant in car load lots or otherwise, or shall at any station upon the roads controlled by defendant be offered to it to be transported over the Pueblo and Arkansas Valley Railroad, or the said railroad and other railroads controlled by defendant, to Pueblo, or to the junction aforesaid, and thence over the plaintiff's railroad to points thereon or beyond the same, and the shipper thereof, (or the consignee if no directions thereunto be given by the shipper), shall direct that such freight or merchandise be delivered to plaintiff or forwarded over plaintiff's railroad, the defendant shall receive and transport the said freight or merchandise from the place of receiving the same to

the junction of the Pueblo and Arkansas Valley Railroad with the railroad of plaintiff near Pueblo aforesaid, and there deliver the same to the plaintiff, to be by the plaintiff transported to the destination thereof, or to the point or terminus of the plaintiff's railroad nearest such destination; and that for the transportation of such freight or merchandise the defendant shall be entitled to demand and receive a reasonable freight money not exceeding the rates and sums by the said defendant at the same time wont to be demanded and received for the transportation of like freight from the same initial point or terminus to the city of Pueblo, when the same is or may be delivered or contracted or received by defendant to be delivered to the Denver and Rio Grande Railway Company or any other person or company operating a railroad in competition with the plaintiff; and if the freight moneys for the transportation of such freight or merchandise shall be prepaid wholly or in part, the defendant, after deducting its reasonable charges aforesaid, shall render the residue of said moneys, if any, together with and at the same time with the said goods to the plaintiff.

*Third*—And that whenever hereafter merchandise or freight shall be received by the plaintiff in car load lots, or otherwise, to be transported over its said railroad to the said Pueblo, or the said point of junction, and thence over defendant's railroad to points upon or beyond the same, and the shipper thereof, (or the consignee, if no directions thereunto be given by the shipper,) shall direct that the same be forwarded over defendant's railroad, or delivered to the defendant, the same shall by the plaintiff be transported to the point of junction aforesaid of its said railroad with the Pueblo and Arkansas Valley Railroad, and there be delivered to the defendant, to be carried and transported by defendant over the said Pueblo and Arkansas Valley Railroad, or the same and other railroads controlled by the defendant, to the destination thereof, or to the point or terminus upon or of defendant's railroad nearest such destination, and that for the transportation of all such freight or merchandise the said defendant shall be entitled to demand and receive a reasonable freight money, not exceeding the rates and sums by the defendant at the same time wont to be de-

manded and received for the transportation of like freight
from Pueblo to the same point or terminus when received from
the Denver and Rio Grande Railway Company, or from any
other person or company operating a railroad in competition
with the plaintiff; and that if the said freight moneys for the
transportation of such freight shall be prepaid to the plaintiff
wholly or in part, the plaintiff, after deducting its reasonable
charges in that behalf, as aforesaid, shall render the residue of
the said moneys, if any, together with, and at the same time
with, the said goods to the defendant.

*Fourth*—And that all freights and merchandise by the de-
fendant received to be delivered to the plaintiff, or forwarded
over plaintiff's railroad, and all freights and merchandise by
the defendant received from the plaintiff to be carried and
transported over defendant's railroad, shall be forwarded, car-
ried and transported by defendant at the same speed, and at
the same intervals of time, and in like cars, and under like
conditions, and with the same conveniences and facilities as
like freights or merchandise marked, consigned or directed to
be delivered, or by defendant, in fact, delivered to any other
person or company operating a railroad in competition with
the plaintiff, or like freights or merchandise by the defendant
received from any other such person or corporation operating
a railroad in competition with the plaintiff.

*Fifth*—And that, whenever either company, in the course of
said business, shall receive from the other, freight or merchan-
dise, loaded in the cars of such other company, and shall use
the cars of such other company for the transportation of such
freight, it shall be the duty of the company, receiving such
cars of the other, if the same shall be unloaded upon its own
line, to return the same with all convenient speed, and without
reloading the same, to the owner thereof, and to pay therefor
reasonable car service or hire, after the same rate and accord-
ing to the course of dealing heretofore established between the
defendant and the Denver and Rio Grande Railway Company;
but if the said plaintiff shall at any time demand of defend-
ant for use upon its said railroad, or to be shipped or trans-
ported, with the freight therein, over its said road, a number of

44

cars in excess of the number of cars of the plaintiff then in use on defendant's road, payment of the hire of said cars shall be made by the plaintiff in advance from week to week, at the rate and price aforesaid; and nothing herein contained shall be deemed to require either company to furnish to the other empty cars to be loaded and used by such other company, either upon its own railroad or elsewhere.

That, whenever and so long as the defendant shall be wont to allow its freight cars to pass to and upon any railroad not owned or controlled by the defendant, it shall be required to allow its freight cars of like character to pass to, upon and over the railroad of the plaintiff to the same extent as to pass to, upon and over the railroads of other persons and companies.

That, whenever and so long as the plaintiff shall allow its freight cars to pass to, upon and over other railroads, not owned or controlled by it, plaintiff shall allow its freight cars of like character and to the same extent to pass to, upon and over the road of defendant, and, save in the case aforesaid, and to the extent aforesaid, neither of said companies, party hereto, shall be required to allow its freight cars to pass to, upon and over the road of the other party.

*Sixth*—It is further ordered, adjudged and decreed by the Court, that all passengers who shall by the plaintiff be transported over plaintiff's railroad to the junction aforesaid, and who shall desire to be carried from thence over said Pueblo and Arkansas Valley Railroad, or the same and other railroads controlled by defendant, shall by defendant, at the said junction, be received into the trains of defendant, and therein carried and transported, with their baggage, to the destination of such passengers, or to the point or terminus of or upon the roads controlled by defendant nearest to such destination; and that all passengers upon defendant's railroad, and persons who shall desire to be carried over defendant's railroad to the said junction, and to proceed thence over plaintiff's railroad, shall by defendant be carried and transported over the said Pueblo and Arkansas Valley Railroad and other railroads controlled by defendant, and delivered, with their baggage, at the said junction of the plaintiff's railroad with the said Pueblo and

Arkansas Valley Railroad, and that, for the transportation of such passengers, with their baggage, defendant shall be entitled to demand and receive the same fare and sum by the defendant at the same time wont to be demanded and received for the transportation of passengers of the same class, and their baggage, from said city of Pueblo to the same other point or terminus on the railroad of defendant, or from the same other point or terminus on the railroad of defendant to said city of Pueblo, when the said passenger is by defendant received from or carried in connection with the Denver and Rio Grande Railway Company, or any other person or corporation controlling a railroad in competition with the plaintiff, and no more; and that all passengers traveling over the road of plaintiff, from any point or place thereon to the said junction, and desiring to proceed from the junction aforesaid over the roads controlled by the defendant, shall receive from the plaintiff a certificate setting forth that such passenger is entitled to proceed from said junction, over the road of the defendant, at the rates and fares above prescribed, and that all passengers traveling upon the road of the defendant, from any point or place thereon to said junction, and desiring to proceed from said junction over the road of plaintiff, shall receive from the defendant a certificate setting forth that such passenger is entitled to proceed over the road of the plaintiff at the rate and fare aforesaid; *provided*, nevertheless, that whenever and so long as the said defendant and the Denver and Rio Grande Railway Company shall be wont to insert in the passage tickets by the said companies respectively sold for passage over their railroads in connection, any limitation of the time within which the passage on said ticket shall be made, the parties hereto, and each of them, shall insert in the certificates hereby above required to be issued to passengers the like limit of time, and the passenger receiving such certificate shall be entitled to passage, by virtue thereof, only where the same is presented and used within the said limit of time; but nothing in this provision shall prevent either company from issuing such certificates without limitation of time, and passengers receiving the same shall be required to pay after the same rate as when traveling upon an unlimited ticket upon the roads of

defendant in connection with the road of the Denver and Rio Grande Railway Company.

*Seventh*—It is further ordered, adjudged and decreed by the Court that passengers traveling over plaintiff's railroad and the railroads controlled by defendant, upon tickets issued by any other railroad company, or otherwise, shall be entitled to travel upon the same trains and in the same cars, and shall be entitled to the same facilities, conveniences, attention and privileges as passengers of the same class traveling upon tickets issued for travel over defendant's railroad and the Denver and Rio Grande Railroad, or the railroad of any person or corporation operated in connection with the railroads controlled by defendant, and in competition with plaintiff's railroad; but this shall not be construed to entitle either company to run its trains over the railroad or railroads controlled by the other company, nor to require or entitle either company to operate the passenger cars of the other company upon its railroad.

*Eighth*—It is further ordered, adjudged and decreed by the Court that if the defendant company doth or shall at any time decline to employ or authorize any other person or corporation controlling or operating a railroad to sell tickets or to issue through bills of lading over the railroads controlled by defendant, and shall refuse to recognize passage tickets or bills of lading issued by any such person or company, said defendant shall not be required to honor any such passage ticket or bill of lading issued by any such person or company over the roads controlled by defendant in connection with the plaintiff's road, nor to transport any passenger or his baggage, or any freights or merchandise, over the roads controlled by defendant upon passage tickets or bills of lading issued by such other person or company.

*Ninth*—But whenever and so long as the defendant is or shall be wont to honor the passage tickets, bills of lading or other contracts of carriage issued by any other company, over the railroads controlled by defendant, or any part thereof, in connection with the Rio Grande Railroad, and to transport passengers and freights thereon, it shall honor the passage tickets, bills of lading and contracts of carriage issued by the said company over defendant's road and the railroad of plain-

tiff, and carry and transport passengers and their baggage upon such tickets, and freights upon such bills of lading or contracts of carriage.

*Tenth*—It is further ordered, adjudged and decreed by the Court that where, in any case, in the transaction of the said business in connection, either company shall have received and transported freights or merchandise over its railroad, or the same, and roads in connection therewith, upon which the freights earned by such company, or any charges advanced by such company, remain unpaid in whole or in part, such company shall be entitled to demand from the other company all such freights and charges remaining unpaid in respect to such freight or merchandise at the time of the delivery thereof.

*Eleventh*—Whenever, and so long as either company, party hereto, is wont to receive, without prepayment of freights or charges thereon, freights or merchandise to be transported over its railroad, and any other railroad operated in competition with the railroad of the other company, party hereto, such company shall be required to receive like freights without demanding prepayment of freights or charges thereon when offered for transporation over its railroad in connection with the railroad of the other company, party hereto, but save in the cases aforesaid, neither of said companies shall be required by virtue hereof to receive or transport freights or merchandise without prepayment of freights and charges thereon, and neither company shall be required to accept for transportation over its road freight upon which the charges have been prepaid to the other, unless the proper portion of such prepaid charges be rendered to the company to which the said freight is offered, together with, and at the same time with, said freight.

*Twelfth*—It is further ordered, adjudged and decreed by the Court that each company shall, at the said junction, receive freights and passengers and their baggage, and sell passage tickets to all those desiring to proceed thence, over the roads of said companies respectively, and each company shall there check the baggage of passengers purchasing tickets over its road, and provide reasonable and proper facilities for the discharge of all duties hereby required to be performed by said companies respectively.

*Thirteenth*—It is further ordered, adjudged and decreed by the Court, that in and about the transaction of the said business in connection, each party shall extend and accord to the other the same privileges, facilities and conveniences in all respects by the same party extended to any person or corporation operating a railroad in competition with the other, without unreasonable or undue discrimination or preference.

*Fourteenth*—It is further ordered, adjudged and decreed by the Court, that if, at any time hereafter, the provisions herein made for the purpose of carrying out and effectuating the terms of this decree in securing to each the rights herein settled and defined, shall appear to be inadequate, either party shall be at liberty to apply to the Court for further directions.

*Fifteenth*—It is further ordered, adjudged and decreed, that the provisions herein contained, so far as the same are applicable to the defendant, shall extend to all railroads situate in Colorado, Kansas, New Mexico, Texas and elsewhere that are either owned, operated or controlled by the defendant.

*Sixteenth*—It is further ordered, adjudged and decreed by the Court, that this decree, and each and every of the directions herein contained, shall be deemed an injunction upon each of the parties hereto, and, from and after the expiration of thirty days after the entry hereof, the same shall be in full force, and all and singular the officers, agents and servants of the respective companies shall, from thenceforward, without service thereof, be required to observe and perform the same, under the penalties of a contempt.

*Seventeenth*—It is further ordered, adjudged and decreed by the Court, that so much of the plaintiff's bill as prays the Court to fix or prescribe the rates or fares to be charged by the defendant, or to apportion rates or fares between the said parties, be, and hereby is, dismissed without prejudice.

It is further ordered, adjudged and decreed by the Court, that the plaintiff recover its costs in this suit expended, to be taxed, and have execution therefor.

*Wells, Smith & Macon,* for complainant.

*George R. Peck* and *Thatcher & Gast,* for defendant.